UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CANDICE LAYTON,
o/b/o B.O., a minor,

               Plaintiff,                     Civil Action No. 12-12934

        v.                           District Judge Victoria A. Roberts
                                        Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17]**

Plaintiff Candice Layton, on behalf of her minor daughter B.O., appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her application for supplemental security income ("SSI"). (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 12, 17). For the reasons set forth below, this Court finds that any error in the Administrative Law Judge's failure to articulate his step three finding is harmless, and substantial evidence supports his conclusion that B.O. is not disabled. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 17) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

# I. BACKGROUND

Claimant B.O. was thirteen years old when her SSI application was filed. (*See* Tr. 65.) She alleged disability primarily on the basis of her mental impairments, including attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder, and bipolar disorder. (*See* Tr. 138.) B.O.'s schooling has been primarily in regular education classes, but she received academic support and accommodations through special education. (*See* Tr. 457, 480, 506, 512, 520.)

## A. Procedural History

On June 5, 2008, Plaintiff protectively filed an application for SSI on behalf of B.O., asserting a disability onset date of May 24, 2001, when B.O. was six years old. (Tr. 65.) The Commissioner initially denied B.O.'s application on December 15, 2008. (*Id.*) Plaintiff requested an administrative hearing, and on January 27, 2010, she and B.O. appeared with counsel before Administrative Law Judge ("ALJ") John Dodson, who considered the case *de novo*. (Tr. 29.) In a July 28, 2010 decision, ALJ Dodson found that B.O. was not disabled within the meaning of the Social Security Act. (*See* Tr. 25.) The ALJ's decision became the final decision of the Commissioner on May 3, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on July 5, 2012. (Dkt. 1, Compl.)

## B. Testimony at the Hearing Before the ALJ

### 1. B.O.'s Testimony

B.O. was age fifteen at the time of her hearing before the ALJ. She testified that she had been attending regular (not special education) classes at school, except that she was repeating pre-algebra and had to take a "learning skills class, which [was] required to help [her] through

getting [her] homework done." (Tr. 32.) She told the ALJ that she had not yet received her grades for the most recent semester, but knew that she had failed biology because she failed the exam. (Tr. 33.) She also said that she was failing choir and she could not figure out why, because what she really wanted to do in life was sing. (Tr. 44.) B.O. testified that she had not passed seventh and eighth grade, although (as her lawyer put it) the school "just kind of moved [her] along." (Tr. 35.)

B.O. said her school had recently recommended that she switch to an alternative community high school. (Tr. 35.) At the time of the hearing, B.O. was serving a five-day suspension for taking a drug from one of her friends. (Tr. 34.) She said she had been suspended about four times before that. (Tr. 35.) Reasons for her suspensions, according to B.O., included missing a detention and being late for class too often. (Tr. 35–36.) But when the ALJ suggested that attendance might be the reason she was failing choir, B.O. said no, she was always on time for choir. (Tr. 48.)

B.O. testified that she is on a different medication "pretty much, like, every year." (Tr. 38.) Recently, she had to stop taking Abilify because she thought she might be pregnant. (*Id.*)

B.O. related that she spent three days in a mental facility after she took a picture of herself with a gun pointed at her head. (Tr. 40.) But she said: "it wasn't no—any intentions, I wasn't depressed, I wasn't, like, trying to harm myself." (*Id.*)

When asked about her difficulties with attention, B.O. said, "sometimes I go to, like, doing one thing then I remember that I have to do something else, and I go do that, and sometimes I'll then catch up on back onto that, I—you know, I make time for things at one time,

3

try and multitask." (Tr. 42.) She confirmed that she got "frustrated," and that she had difficulty being patient, explaining, for example: "when . . . I text somebody and they don't text me like—like five minutes, like in five minutes I'll text somebody again and be like, you know, are you still there? You still going to talk to me or—you know, so I'm not that patient, but I try to be." (Tr. 43–44.)

B.O. testified that she liked to sing, watch movies, and "hang out with [her] friends." (Tr. 46, 49.) She said she and her friends typically would go to a friend's house and talk. (Tr. 47.)

### 2. Layton's Testimony

The claimant's mother, Layton, testified that she applied for disability for B.O. because her daughter had "[a] lot of behavior issues" and she received "calls from the schools all the time," including teachers telling her "they couldn't even teach their class because of [B.O.]." (Tr. 51.) According to Layton, the teachers told her that B.O. "would never stay in her seat, she'd be talking to everybody, [and] she wouldn't do her homework." (*Id.*)

Layton said B.O. repeated second grade and also failed seventh and eighth grade but "they just moved her to the next grade." (Tr. 51–52.)

Regarding the photograph B.O. took of herself with a gun, Layton explained that her neighbor showed it to her after B.O. posted it on MySpace. (Tr. 52.) Layton said that she called the police after her coworkers told her that the photograph indicated B.O. needed help. (Tr. 52–53.) The police took B.O. to a mental facility where she stayed for three to four days. (Tr. 52–52.)

Layton testified that B.O. had been "in therapy most of her life." (Tr. 53.) When B.O.'s attorney asked Layton whether she thought B.O. could make good judgments and keep herself safe, Layton responded: "She doesn't realize the consequences of her actions, because she keeps repeating things, she may look back and say, 'Oh, that was wrong' but she knows it was wrong because I said it was wrong, but I don't think she's connecting with what she's doing and how it affects everything around her." (Tr. 53.)

Layton said that B.O. was currently suspended for taking a Xanax at school. (Tr. 54.) The school had called Layton to pick B.O. up because she was acting strange; she was tired and her speech was impaired. (Tr. 54.) Layton took B.O. to a doctor, who sent her to the emergency room. (Tr. 54.) B.O. continued to deny that she had taken anything for a long time before finally admitting that she had taken the Xanax, but "there was a couple of different stories that she told me, that it was a half, that it was a whole . . . ." (*Id.*)

When asked about B.O's difficulty with homework, Layton said, "I've never seen her bring it home, I ask her where's her homework, she—she says she does it at school. You know, over the years she's always kind of hidden it if there was papers she'd get rid of them or, you know—so it was a matter of me coordinating with the school . . . ." (Tr. 55.)

When asked why B.O.'s school suggested she consider another school for B.O., Layton said, "Because she's . . . failing . . . they feel that she's going to get lost there. They can't provide for her what she needs." (Tr. 55.) Layton agreed with her attorney that such had "been the case in the last several years with the other school situations also." (Tr. 55.) When asked what she observed as preventing B.O. from succeeding in school, Layton said "she doesn't get to class on

5

time, . . . she doesn't do the homework, she doesn't understand the assignments, . . . she doesn't get basic math, she doesn't understand it, she tries but she—she doesn't, you know, understand it." (Tr. 56.)

Regarding B.O.'s medication, Layton said "she acts up whether she has the medication or not, we still haven't found the right medication, we've been on several different medications, combinations, and she still seems to continue the path that she's taking." (Tr. 56.) In addition, Layton said, "sometimes she doesn't [take her medication] because she thinks that she's fine." (Tr. 56.) At times, B.O. would say she took her medication but would hide the pills instead. (Tr. 60.)

Layton explained what she meant by saying that B.O. "acts up":

> Well, when I tell her to do something she—she won't do it. Like I have to fight with her constantly to get anything done with her. Like right now she's grounded because of the incident, she doesn't understand why she's grounded, she thinks because she told me that this was going to happen that it should be okay. She'll—she'll keep[] asking me if she can go somewhere and I'll say no, you know, that's it, she'll come back five—five minutes later, ask me again. She's—she's not getting it and then her and I—I have to watch because her and I get into the arguments and it—it's kind of pointless really because she's not really listening—listening to what I'm saying, but she—she gets that tunnel vision on what she wants to do and she'll—she'll just keep at you, you know.

(Tr. 57.)

According to Layton, B.O. has needed medication to sleep "since she was little, she wouldn't sleep, she'd be up in the middle of the night getting into things, do things that she's not

supposed to be doing, and she'd wander." (Tr. 59.) And since B.O. started ADHD medication, the sleeping aids were needed "to kind of counteract that . . . so she would be able to sleep." (*Id.*)

Layton said she had just learned that B.O. hears voices. (Tr. 59.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). A child under age eighteen is considered "disabled" within the meaning of the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). The Social Security regulations set forth a sequential three-step process for determining children's disability claims: first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *See* 20 C.F.R. § 416.924.

To "meet" a listed impairment, a child must demonstrate both "A" and "B" criteria of the impairment. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* To be found disabled based on meeting a listed

7

impairment, the claimant must exhibit all the elements of the Listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment(s) do not "meet" a listed impairment, the impairment(s) may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. *See* 20 C.F.R. §§ 416.926, 416.926a; *Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003) ("Medical equivalency is covered by 20 C.F.R. § 416.926; functional equivalency is covered by Section 416.926a."). "To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, No. 1:08CV254, 2009 WL 1741375, at *8 (S.D. Ohio June 18, 2009) (citing 20 C.F.R. § 416.926(a)). A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;

> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or

> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Koepp v. Astrue*, No. 10-C-1002, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011) (citing 20 C.F.R. § 404.1526(b)); *see also* 20 C.F.R. § 416.926. "The essence of these subsections is that

8

strict conformity with the Listing Requirements is not necessarily required for a finding of disability." *Emeonye v. Astrue*, No. 04-03386, 2008 WL 1990822, at *4 (N.D. Cal. May 5, 2008). Thus, "[i]f a plaintiff is only able to demonstrate most of the requirements for a Listing or if he or she is able to demonstrate analogous or similar impairments to the impairments of a Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show impairments of equal medical significance." *Id.*

To determine functional equivalence, an ALJ is to evaluate six "domains" of functioning: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a. Functional equivalence to a listed impairment exists when the child has an "extreme" limitation in one, or "marked" limitations in two of the six domains. *See* 20 C.F.R. § 416.926a(d). A "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I). A marked limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(I). An extreme limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

At step one, ALJ Dobson found that B.O. had not engaged in substantial gainful activity since June 5, 2008, the application date. (Tr. 18.) At step two, he found that Plaintiff had the following severe impairments: attention deficit hyperactivity disorder, combined type; oppositional defiant disorder; bipolar disorder/mood disorder, not otherwise specified; hypothyroidism; and heart murmur. (*Id.*) At step three, the ALJ concluded that B.O. did not have an impairment or combination of impairments that met or medically equaled the criteria of the listings. (Tr. 19.) The ALJ also concluded that B.O. did not have an impairment or combination of impairments that functionally equaled the listings. (Tr. 19–25.) Specifically, the ALJ found that B.O. had less than marked limitation in three domains (acquiring and using information, attending and completing tasks, and interacting and relating with others) and no limitation in three domains (moving about and manipulating objects, caring for herself, and health and physical well-being). (Tr. 21–25.) The ALJ therefore concluded that B.O. was not disabled as defined by the Social Security Act from June 5, 2008, through the date of his decision. (Tr. 25.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

10

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

11

## IV. ANALYSIS

### A. Comparison to the Listings

Plaintiff argues that "a reader of the ALJ's decision cannot tell what Listing, if any, was actually reviewed and/or analyzed relative to plaintiff's impairments," and that this omission is reversible error. (Pl.'s Mot. Summ. J. at 15.) Plaintiff suggests that B.O.'s impairments meet one or more of the mental category of impairments under listing 112.01: mood disorder (112.04), anxiety disorder (112.06), eating disorder (112.07), personality disorder (112.08), or ADHD (112.11). (Pl.'s Mot. Summ. J. at 15.) Plaintiff focuses on the listing for ADHD, providing citations to record evidence, without explanation, for each of six criteria in the listing. (*Id.* at 16.)

The Commissioner argues that the ALJ "reasonably found B.O. did not meet or medically equal the requirements of any listed impairment" because DDS consultant Dr. Yousuf reviewed B.O.'s medical records and opined that B.O.'s impairments did not meet or medically equal a listing. (Def.'s Mot. Summ. J. at 5.) The Commissioner also argues that Plaintiff's "string cites to pages within the record" do not establish that B.O. met or medically equaled the listing for ADHD. (*Id.* at 6–9.) In particular, the Commissioner argues that the records cited did not show marked impulsiveness or marked impairment in age-appropriate cognitive or communicative function, social function, personal function, or concentration, persistence, or pace. (*Id.* at 7–9.) Therefore, the Commissioner argues, "any error committed by the ALJ in not providing additional discussion of whether Plaintiff satisfied the requirements of a listed impairment should be considered harmless." (*Id.* at 9.)

12

The ALJ's finding that B.O. "does not have an impairment or combination of impairments that meets or medically equals the listings" is not supported by a single sentence of analysis or evidence. (*See* Tr. 19.) Instead, the ALJ immediately moved on to comparing the evidence to the six domains of functional equivalence. (*Id.*)

A bare conclusion that the claimant did not meet or equal any listing, without even identifying the relevant listings that were considered, does not permit this Court to perform meaningful judicial review. *See* 42 U.S.C. § 405(b)(1) (requiring "a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based"); *M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 858–59 (E.D. Mich. 2012) (Goldsmith, J., adopting report and recommendation of Michelson, M.J.) (discussing case law). The ALJ's discussion of the six domains of functional equivalence does not "stand in" for the analysis required to find that the claimant did not meet or equal the listings. *See id.* at 859 n.6 (discussing case law). The ALJ is required to evaluate and make separate determinations on whether Claimant's impairments meet, medically equal, or functionally equal the listings. *See id.*

Nonetheless, remand is not required if the ALJ's failure to articulate his step three findings is harmless in nature. *See id.* at 859–60 (discussing case law); *cf. Reynolds v Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) ("[I]n this case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence Reynolds put forth could meet this listing."). Where "concrete factual and medical evidence" is "apparent in the record" such that a court can discern how the ALJ "would have" reasoned, the outcome

13

should be affirmed. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 656–57 (6th Cir. 2009); *M.G.*, 861 F. Supp. 2d at 860. The Court will therefore examine the record to determine whether the same disability outcome would have resulted had the ALJ expressly compared the evidence to the listings. In doing so, however, the Court must exercise caution. The Court will not find the ALJ's procedural error harmless merely because substantial evidence exists in the record that could uphold the ALJ's decision. *See M.G.*, 861 F. Supp. 2d at 860. In *Rabbers v. Commissioner of Social Security*, the Sixth Circuit warned that it may be difficult or impossible to determine whether an error is harmless when the record contains "conflicting or inconclusive evidence" not resolved by the ALJ or "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider." 582 F.3d at 657–68. This Court cannot speculate as to how the ALJ might have weighed such evidence. *See M.G.*, 861 F. Supp. 2d at 860–61.

The listing for ADHD requires (A) "[m]edically documented findings" of all of the following: (1) marked inattention; (2) marked impulsiveness; and (3) marked hyperactivity; and (B) at least two of the following:

> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or
>
> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and

available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. pt. 404, subpt. P, app. 1, § 112.11.

The Commissioner focuses on the (B) criteria. The Commissioner first argues that B.O.'s full-scale IQ scores preclude a finding of marked impairment in age-appropriate cognitive or communicative function. (Def.'s Mot. Summ. J. at 7.) The listing provides: "A primary criterion for limited cognitive function is a valid verbal, performance, or full scale IQ of 70 or less." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.00(C)(2)(a). In a March 2004 assessment by school psychologist William Irving, B.O.'s test scores were "a Verbal Scale IQ of 87 (regressed = 92), a Performance Scale IQ of 84 (regressed = 92), and a full scale IQ of 84 (regressed = 90)." (Tr. 539.) In March 2007, Dr. Irving reported B.O. had "a Full Scale IQ of 95 (regressed = 97)." (Tr. 502.) In March 2009, B.O.'s full scale IQ was measured at 91, according to a "Multidisciplinary Evaluation Team" report that recertified her eligibility for special education. (Tr. 644; *see* Tr. 623.) Based on these scores, substantial evidence supports the ALJ's finding that B.O.'s cognitive functioning was not limited.

15

Plaintiff's string cite of evidence to support that B.O. showed marked impairment in age-appropriate cognitive or communicative function does not compel a different outcome. Plaintiff cites the following evidence:

*Age Eight*

- a May 2003 intake assessment from Professional Medical Center stating that B.O. and her mother reported coming in for services because of "trouble in school" (Tr. 382);

- the "history of illness" and "personal history" reported in a July 2003 psychological evaluation by limited licensed psychologist Donna Sperry, M.A., and fully licensed psychologist Hampton Walker, Ph.D., stating that B.O. was "not able to keep up with her classmates in the area of reading skills," and had "a gradual deterioration including being diagnosed with ADHD at age 4," most recently having "failed the second grade" (Tr. 178);

*Age Nine*

- school psychologist Dr. Irving's March 2004 assessment, concluding: "[c]urrent test results, which are considered to be underestimates of her true potential, place her overall level of intellectual functioning in the lower portion of the Low Average range with roughly comparable verbal and nonverbal abilities," and "[a]cademically, [B.O.]'s current levels of achievement in the basic skill areas range from being lower average to upper borderline for her age, ranging f[ro]m being roughly consistent with to moderately below those expected for her measured intellectual abilities" (Tr. 539);

16

- a September 2004 individualized education program ("IEP") for special education noting that B.O.'s "performance in the school setting is greatly affected by her ADHD" but concluding that B.O. should "be involved and progress in the general curriculum" except when "meeting with the resource teacher" (Tr. 520);

*Age Ten*

- a March 2005 "medication review report" from Professional Counseling Center noting: "still not paying attention [and] not getting good grades, behind w[ith] doing her homework" (Tr. 339);

- a July 2005 "consumer discharge summary" from St. Clair County Mental Health Authority ("St. Clair County MHA") noting "difficulties in school behaviorally and academically" (Tr. 337);

- a September 2005 assessment by child psychiatrist John V. Baugh of St. Clair County MHA noting that B.O. "seems to have significant problems with learning especially with reading and writing" and "significant traits of impulsivity and poor attention span," but also stating, "[h]er IQ I would estimate at being somewhat low average" (Tr. 327–28);

*Age Eleven*

- a March 2006 "medical review clinical note" by licensed social worker Anne Switchulis of St. Clair County MHA, noting "continued . . . concern [in] some

17

academic subjects" but stating that B.O. "has been able to focus [and] is less impulsive since last med. review" (Tr. 254);

*Age Twelve*

- a March 2007 psychological evaluation by school psychologist Dr. Irving, stating that B.O. "has a history of inconsistent academic progress and is currently receiving supportive services under the certification of O[ther] H[ealth] I[mpairment], primarily due to a diagnosis of ADHD for which she is currently taking a few different medications," but that "[h]er teachers indicate that [her] cooperation and motivation have been improving this school year" (Tr. 502);

*Age Thirteen*

- a March 2008 progress note from St. Clair County MHA that says "Mom reports that [B.O.]'s grades are a significant concern at this time" (Tr. 442);

*Age Fourteen*

- a January 2009 intake assessment from New Oakland Child-Adolescent and Family Center, stating that B.O.'s "mom claims she has problems at school—failing classes; behavioral problems reported at school" (Tr. 646);

- a March 2009 "Multidisciplinary Evaluation Team" report that recertified B.O.'s eligibility for special education, stating that B.O. "is diagnosed with ADHD [and] bipolar disorder," "manifests cognitive defects on working memory and academic defects in math calculation, math reasoning, and written expression," and "[h]er attention span is short in the classroom" (Tr. 623);

18

- a March 2009 "educational evaluation" by teacher consultant Lynne A. Wasiak, noting that B.O. "failed all core classes during the first semester this year" and concluding that B.O.'s "fluency with academic tasks is within the average range of others at her age level," "[h]er academic skills are low average," and "[h]er ability to apply academic skills is low" (Tr. 624–26);

- an April 2009 IEP stating that "[i]n the classroom setting, [B.O.] has difficulty with getting to class on time, bringing materials to class, finishing homework, staying on task, participating in class, and difficulty with test-taking"; she "has low energy"; she "has improved greatly since she began taking medication, but still has work habits that do not help her to maintain consistent school success"; she "is intelligent and does well in English class, has a good memory when she does her homework and pays attention in class, and is capable of quality work"; she "seems to have the most difficulty with math and has very little confidence in her ability in this area," tending "to give up without fully investing the energy into learning math concepts"; she "doesn't prioritize homework in her classes to insure that all is done for the next day" but "[s]he has improved greatly" (Tr. 632); and she "has difficulty w[ith] work turn-in [and] paying attention in class at a sufficient level to maintain passing grades" (Tr. 635);

*Age Fifteen*

- a November 2009 summary of "Present Levels of Educational Performance," with test scores including a full scale IQ of 91, stating that B.O. "has a hard time with

19

math calculation and understanding the order of operation," "is also in a team taught English class for extra support," "has struggle[d] with her first semester of high school and at the current time she is failing 3 out of 6 classes," and "has had many missing assignments" although she "expresses to Ms. Douglas on a daily basis she has done all of her work and has nothing to work on" (Tr. 644); under "Area of Weakness," it states that B.O. "can be easily distracted" and "[h]er focus seems like it is more on the social aspect of school and not on her academics" (Tr. 645);

- a January 2010 Social Security Administration teacher questionnaire completed by special education teacher Terry Douglas, rating B.O.'s problems with acquiring and using information as one out of five ("no problem") on nine of ten items, and as three out of five ("an obvious problem") on one item, "comprehending and doing math problems"; Douglas also states that "[B.O.] has a learning skills class to help her with work from her general education classes" but "[s]he has not used the time or other class time well," and "has failed 4 out of 6 classes for the last semester" with "many missing assignments, low test and quiz scores, [and] many absents, and [she] has not seemed to care about her grades" (Tr. 616); and

- Layton's hearing testimony about B.O.'s difficulties at school (Tr. 56).

(*See* Pl.'s Mot. Summ. J. at 16.)

The evidence Plaintiff cites undoubtedly shows that B.O. struggles with cognitive and communicative function, but it does not establish a "valid verbal, performance, or full scale IQ

20

of 70 or less." Moreover, the evidence just as clearly shows that B.O.'s impairment in these areas is not "marked." The child disability mental impairment listings provide:

> Where "marked" is used as a standard for measuring the degree of limitation it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis. When standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.00(C)(2)(a). B.O.'s cognitive and communicative abilities are consistently rated as low average to average, well above the "two standard deviations below the norm" required for marked impairment. (*See* Tr. 327, 503, 539, 625–26.) Although she has repeatedly failed classes, the record suggests that this is due in significant part to lack of motivation, not ability. (*See* Tr. 615–17, 635, 644.) The school records show she was consistently found capable of general curriculum classes with some assistance, and did not require placement in special education classes. (*See* Tr. 457, 480, 506, 512, 520.)

The Commissioner also argues that the ALJ would have found that B.O. did not have marked impairment in social functioning. (*See* Def.'s Mot. Summ. J. at 8.) According to the listing, social functioning

> refers to a child's capacity to form and maintain relationships with parents, other adults, and peers. Social functioning includes the ability to get along with others (e.g., family members, neighborhood friends, classmates, teachers). Impaired social functioning may be caused by inappropriate externalized actions (e.g., running away, physical aggression—but not self-injurious

actions, which are evaluated in the personal area of functioning), or inappropriate internalized actions (e.g., social isolation, avoidance of interpersonal activities, mutism). Its severity must be documented in terms of intensity, frequency, and duration, and shown to be beyond what might be reasonably expected for age. Strength in social functioning may be documented by such things as the child's ability to respond to and initiate social interaction with others, to sustain relationships, and to participate in group activities. Cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity, appropriate to a child's age, also need to be considered.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.00(C)(2)(b). Plaintiff cites the following evidence to argue that B.O. is markedly impaired in this area:

*Age Six*

- an October 2000 psychiatric assessment noting that B.O. "occasionally becomes mean and aggressive toward her sibling and peers" and that her mother indicated she was "frequently aggressive toward others" (Tr. 165, 171);

- a June 2001 "clinical assessment" from Professional Counseling Center stating that B.O. demonstrated "problems with interpersonal relationships with parent, grandparents, and siblings, oppositional defiant behavior" (Tr. 397);

*Age Seven*

- an April 2002 "medication review report" from Professional Counseling Center stating, "[i]mprovements noted but still has episodes of aggression towards brother etc." (Tr. 368);

22

*Age Eight*

- a July 2003 "medical assessment of ability to do school and age-appropriate activities (mental)" by limited licensed psychologist Donna Sperry, rating as "poor" B.O.'s ability to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability (Tr. 183);

- Sperry's written psychological evaluation, also signed by fully licensed psychologist Hampton Walker, stating that B.O. could "become loud and aggressive" when her wants or needs were not met, and reporting that B.O. said she had "few to no friends" (Tr. 178);

*Age Nine*

- a February 2004 record of observations of B.O. during a one-hour period at school, recording that she got angry with a classmate with whom she was paired when he won the math game they were playing (Tr. 537);

*Age Ten*

- an August 2005 "Bio-Psychosocial Assessment" from St. Clair County MHA, reporting that B.O. could be "aggressive and impulsive," had "incidents of pushing and tripping other students," and was "teased by her peers" (Tr. 354);

- a September 2005 progress note by social worker Anne Switchulis from St. Clair County MHA, stating, "[s]taff at school reports that [B.O.] was kicking another student at recess and calling others names" (Tr. 317);

23

*Age Eleven*

- a December 2005 "medication review" by a nurse practitioner at St. Clair County MHA, reporting that B.O. described two "physical fights" with a friend (Tr. 287);

- a December 2005 progress note by Switchulis, stating that B.O. reported being teased by other children (Tr. 290);

- a January 2006 progress note by Switchulis, stating that B.O. reported "a fight with her brother and brother's friend in which she hit them both" (Tr. 273); and

*Age Fourteen*

- a March 2009 initial assessment from New Oakland Child-Adolescent and Family Center noting "drama at school—nerdy kids," "arguments with boys," and "pushed peer at school," but also indicating "average" "involvement in social activities" (Tr. 647).

(Pl.'s Mot. Summ. J. at 16.) The trend of this evidence suggests improvement over the years. Moreover, B.O. is consistently described throughout the record as friendly and socially engaged. (*See* Tr. 125, 164, 209, 255, 327, 351, 361, 416, 434, 440, 502, 604, 632, 645.) Overall, the record does not establish marked impairment in B.O.'s ability to function socially.

As the Commissioner points out, "Plaintiff does not argue or provide any cites to suggest that B.O. had marked limitations in personal functioning. (*See* Def.'s Mot. Summ. J. at 8.) The listing provides: "Personal functioning in adolescents pertains to self-care," focusing "on the adolescent's ability to take care of his or her own personal needs, health, and safety without assistance. Impaired ability in this area is manifested by failure to take care of these needs or by

24

self-injurious actions." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.00(C)(4)(a).[1] The Commissioner cites evidence "that B.O. had no difficulties with activities of daily living" (Def.'s Mot. Summ. J. at 8), including a September 2005 intake assessment from St. Clair County MHA stating that B.O. "performs activities of daily living as age-appropriate including dressing self, making snacks for self" and "[t]his is an area of strength for [her]" (Tr. 360), and a February 2008 St. Clair County MHA assessment indicating no impairment in activities of daily living and personal hygiene or self-care (Tr. 436). Although B.O. took a picture of herself with a loaded gun pointed at her head, she has repeatedly denied any intent to hurt herself, and it appears to have been an isolated incident. (*See* Tr. 40, 406, 415, 428, 600.) The Court agrees with the Commissioner that there is no evidence of marked impairment in age-appropriate personal functioning.

As noted above, to meet the criteria in the listing for ADHD, a claimant must have marked impairment in at least two of the four areas of age-appropriate function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.11. Because the evidence does not show marked impairment in three of the four—age-appropriate cognitive or communicative functioning, social functioning, or personal functioning—it is apparent that the ALJ would not have found that B.O.

---

1       In primary school children (age 6 to 12), personal functioning "pertains to self-care; *i.e.*, personal needs, health, and safety (feeding, dressing, toileting, bathing; maintaining personal hygiene, proper nutrition, sleep, health habits; adhering to medication or therapy regimens; following safety precautions). Development of self-care skills is measured in terms of the child's increasing ability to help himself/herself and to cooperate with others in taking care of these needs. Impaired ability in this area is manifested by failure to develop such skills, failure to use them, or self-injurious actions." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.00(C)(2)(c) & (C)(3).

met the criteria in the listing for ADHD. Nor would the ALJ have found that B.O. met the criteria in the listings for mood disorders (112.04), anxiety disorders (112.06), eating disorders (112.07), or personality disorders (112.08), because each of these also require marked impairment in at least two of the four areas of age-appropriate function. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In addition, it is apparent that the ALJ would not have found that B.O.'s impairments medically equaled the listing criteria. The record includes a "Childhood Disability Evaluation Form" completed by Zahra Yousuf, M.D., on December 15, 2008. (Tr. 609–14.) Dr. Yousuf is a psychiatrist. (*See* Tr. 65; Program Operations Manual System (POMS) § DI 26510.090(D), *available at* http://policy.ssa.gov/poms.nsf/lnx/0426510090) (last updated Aug. 29, 2012).) Based on her review of the records, Dr. Yousuf indicated that B.O.'s "impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings." (Tr. 609.) As the Commissioner pointed out, "[n]o treating physician, psychiatrist, or other mental health treatment professional offered any opinion to the contrary." (Def.'s Mot. Summ. J. at 10.)

The Court finds that it is apparent from the record that the same disability outcome would have resulted had the ALJ expressly compared the evidence to specific listings. Plaintiff has not identified any "conflicting or inconclusive evidence" not resolved by the ALJ or "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider." *See Rabbers*, 582 F.3d at 657–68. Remand for the ALJ's failure to articulate his step three finding "would be an idle and useless formality." *See id.* at 654.

### B. Credibility

Plaintiff argues that the ALJ did not address the credibility of the testimony of B.O. or her mother, both of whom testified at the hearing. (Pl.'s Mot. Summ. J. at 17.) The Commissioner points out that "Plaintiff fails to identify any testimony from her o[r] B.[O]. that contradicts the ALJ's finding that B.O. had severe mental impairments, but those impairments were not disabling," and argues that any error is therefore harmless. (Def.'s Mot. Summ. J. at 10–13.)

Neither Plaintiff nor Commissioner cited any authority regarding whether the credibility finding is mandatory. The Sixth Circuit noted in *Siebert v. Comm'r of Soc. Sec.*, 105 F. App'x 744 (6th Cir. 2004), that although the plaintiff cited *Bailey v. Comm'r.*, 1999 WL 96920 at *3 (6th Cir.1999), to argue that the ALJ erred by failing to make a credibility finding, the court in that case "merely pointed out that it is the ALJ, as opposed to the appellate courts, that must make credibility determinations." 105 F. App'x at 747. The *Siebert* court did not rule on the issue because it found that the ALJ had made a credibility finding. *Id.*

Even if the ALJ is required to always expressly make a credibility finding, in this case any such error was harmless. The ALJ stated: "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record." (Tr. 20.) In the very next sentence, the ALJ found that "[t]he evidence establishes that Claimant suffers from attention deficit hyperactivity disorder, oppositional defiant disorder, and bipolar disorder/mood disorder,

27

NOS treated with medication and therapy . . . ." (*Id.*) One can reasonably infer that the ALJ believed it was unnecessary to make a credibility finding because he found claimant's allegations were substantiated by the objective medical evidence. In the ALJ's analysis of the six domains of functional equivalence, he appeared to take B.O.'s and Layton's allegations as true. He found that B.O.'s "functioning is below grade level," "[t]here is excessive absenteeism and she is failing classes" (Tr. 21), she "has difficulty focusing in the classroom and completing tasks secondary to distractibility" (Tr. 22), and she "is disrespectful of others and, according to her mother, steals" (Tr. 23). Plaintiff has not pointed to any testimony from B.O. or Layton that specifically contradicts any of the ALJ's findings. The Court finds that any error in the ALJ's failure to expressly make a credibility finding was harmless.

### C. Teacher Questionnaires

Plaintiff argues that the ALJ did not even mention two teacher questionnaires that Plaintiff says were not contradicted. (Pl.'s Mot. Summ. J. at 17.) The Commissioner responds that the teachers' opinions are not entitled to special deference, that the ALJ did expressly address both opinions, that the opinions were "directly contradicted" by the opinion of Dr. Yousuf, and that the opinions are "not necessarily inconsistent with the ALJ's opinion." (Def.'s Mot. Summ. J. at 14–16.)

The opinions of teachers are considered "other sources" as defined in 20 C.F.R. § 416.913(d). They may be used "to show the severity of your impairment(s) and . . . if you are a child, how you typically function compared to children your age who do not have impairments." *Id.* Social Security Ruling 06-03p provides that the ALJ "generally should explain the weight

given to the opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 6, 2006). The Sixth Circuit has stated: "[w]hile the ruling notes that information from 'other sources' cannot establish the existence of a medically determinable impairment, the information 'may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

The Commissioner correctly points out that the ALJ did expressly discuss both teacher questionnaires. Although the ALJ mistakenly cited one of the questionnaires as exhibit B14F rather than B4E, the ALJ was clearly discussing teacher Donna Russell's September 2008 questionnaire when he said: "In September 2008, Claimant's teacher reported that Claimant had difficulty focusing on the task at hand and was easily distracted. Claimant was often absent and hid in the bathroom." (Tr. 19.) The ALJ correctly cited the January 2010 opinion of teacher Terry Douglas as exhibit B18F when he stated: "In January 2010, Claimant's teacher in a learning skills class reported Claimant had been absent 39 days and did not use class time well. She missed many assignments and was failing four of six classes. She had a hard time concentrating in class, did not make good decisions and, as of the date of the teacher's report, was on a five-day suspension for taking another student's medication." (Tr. 19.)

The teacher questionnaires rated B.O.'s functioning in the six functional areas on a scale ranging from one, indicating "[n]o problem," to five, indicating "[a] very serious problem." (*See*

29

Tr. 129–36; Tr. 615–22.) In the domain of acquiring and using information, neither teacher rated any of the ten activities above a three, which indicates "[a]n obvious problem." Douglas rated one activity as an obvious problem: "comprehending and doing math problems." (Tr. 616.) Russell also rated that activity as a three out of five, and additionally rated "[c]omprehending oral instructions" as a three out of five. (Tr. 130.) These ratings do not indicate serious impairment and are therefore not in conflict with the ALJ's finding that B.O. "has less than marked limitation in acquiring and using information." (*See* Tr. 21.)

The ALJ specifically noted in making this finding that although "[t]here is excessive absenteeism and [B.O.] is failing classes," "her memory is intact and her defiant behaviors have decreased with medication." (Tr. 21.) Plaintiff argues these statements are not supported. (Pl.'s Mot. Summ. J. at 19–20.) But the ALJ's statement that B.O.'s memory was intact is supported by numerous results of mental status testing in the record. (*See* Tr. 165, 180, 217, 330, 332, 400, 416, 444, 579, 584, 593, 605, 649.) His finding of improvement in defiant behavior is supported by the March 2009 progress note from New Oakland Child-Adolescent and Family Center, which was discussed by the ALJ (Tr. 19), and which stated that B.O. was "doing better overall in school—she's less defiant," and "mom can tell there is a difference at home—[B.O.] is less defiant" (Tr. 651). The ALJ's finding that B.O. "has less than marked limitation in acquiring and using information" is supported by substantial evidence.

In the domain of attending and completing tasks, six of the thirteen activities were rated as one out of five ("[n]o problem") or two out of five ("[a] slight problem") or not applicable by

30

both Douglas and Russell.[2] (Tr. 131, 617.) These rating are not so extreme that it was unreasonable for the ALJ to find that B.O. "has less than marked limitation in attending and completing tasks" despite her "difficulty focusing in the classroom and completing assigned tasks secondary to distractibility." (Tr. 22.) The DDS consulting psychiatrist who reviewed B.O.'s medical records, Dr. Yousuf, indicated that B.O. had "less than marked" limitations in that domain. (Tr. 611.) The psychologist who examined B.O. for DDS, Dr. Gerald S. Kirzner, concluded that B.O. "would be able to understand, retain and follow through with basic simple instructions." (Tr. 606.) The ALJ's finding was supported by substantial evidence.

In the domain of interacting and relating with others, Russell indicated that she observed no problems. (Tr. 132.) Douglas rated six of thirteen activities as a "serious" or "very serious" problem.[3] (Tr. 618.) But in light of Russell's opinion that B.O. had no problems in this area and Dr. Yousuf's finding that her limitations in this domain were "Less Than Marked," it was not

---

2    Russell rated one activity, "[c]ompleting class/homework assignments" as five out of five. (Tr. 131.) It is not clear how Douglas rated this activity because he marked both one-out-of-five and five-out-of-five. (Tr. 617.) Russell rated two other activities—"[c]ompleting work accurately without careless mistakes," and "[w]orking at reasonable pace/finishing on time"—as four out of five, indicating "a serious problem." (Tr. 131.) Douglas rated "[w]orking at reasonable pace/finishing on time" as five out of five. He marked both one out of five and five out five for "[c]ompleting work accurately without careless mistakes." (Tr. 617.) Russell also rated "[f]ocusing long enough to finish assigned activity or task," and "[r]efocusing to task when necessary," as four out of five, (Tr. 131), but Douglas rated those as one out of five (Tr. 617).

3    Douglas rated five of thirteen activities as "[n]o problem" (1/5), one activity as "[a] slight problem" (2/5), and one activity ("[u]sing language appropriate to the situation and listener") as "[a]n obvious problem" (3/5). (Tr. 618.) Douglas rated two activities as "[a] very serious problem" (5/5): "[s]eeking attention appropriately" and "expressing anger appropriately," and four activities as "[a] serious problem" (4/5): "[a]sking permission appropriately," "[f]ollowing rules (classroom, games, sports)," "[r]especting/obeying adults in authority," and "[r]elating experiences and telling stories." (*Id.*)

unreasonable for the ALJ to find that B.O. had "less than marked limitation in interacting and relating with others" despite Douglas's ratings. (*See* Tr. 23.)

In the domain of self-care, Russell rated all activities as three out of five or less. (Tr. 134.)[4] Douglas identified problems with all but one activity, and rated six of the ten activities as "very serious," or five out of five. (Tr. 620.)[5] Nevertheless, in light of Russell's ratings and Dr. Yousef's finding that B.O. had no limitations in this domain, it was not unreasonable for the ALJ to find that B.O. had no limitation in this domain despite Douglas's indication of problems.

Russell and Douglas both indicated no problems in the domain of "moving about and manipulating objects." (Tr. 133, 619.) This supports the ALJ's finding of no limitations in this domain. (Tr. 24.)

Russell indicated no problems in the domain of "health and physical well-being" (Tr. 135). Douglas noted frequent absences due to illness and stated that B.O. "does not make good decisions and does have a hard time concentrating in class." (Tr. 621.) Dr. Yousuf indicated that B.O. had no limitation in this area (Tr. 612), and the consultative examiner, doctor of osteopathy Timothy Gates, reported that B.O.'s physical exam was normal other than a heart murmur (Tr.

---

4       Russell rated two of ten activities as three ("[c]ooperating in, or being responsible for, taking needed medications," and "[u]sing appropriate coping skills to meet daily demands of school environment"), and all others as one or two. (Tr. 134.)

5       Douglas rated "[u]sing appropriate coping skills to meet daily demands of school environment," "[h]andling frustration appropriately," "[b]eing patient when necessary," "[u]sing good judgment regarding personal safety and dangerous circumstances," "[i]dentifying and appropriately asserting emotional needs," and "[r]esponding appropriately to changes in own mood (e.g., calming self)," as five out of five. (Tr. 620.) He rated "[c]ooperating in, or being responsible for, taking needed medications," "[c]aring for physical needs (e.g., dressing, eating)," and "[k]nowing when to ask for help" as three out of five. (*Id.*)

32

602). The ALJ's finding that B.O. had no limitations in this domain was supported by substantial evidence.

In summary, the two teacher questionnaires do not contradict the ALJ's findings, which are supported by substantial evidence, and his handling of them does not require remand.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that any error in the Administrative Law Judge's failure to articulate his step three finding is harmless, and substantial evidence supports his conclusion that B.O. is not disabled. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 17) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596–97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception

33

applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  August 2, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 2, 2013.

s/Jane Johnson
Deputy Clerk

34